# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 4, 2009

Charles R. Fulbruge III
Clerk

No. 07-20725

JULIAN JAMES, Individually; DAPHNE BATES HARRISON, Individually and as Representative of the Estate of Hiji Eugene Harrison, Deceased, and as Next Friend of H.E.H. a Minor,

                                        Plaintiffs - Appellants

v.

HARRIS COUNTY,

                                        Defendant - Appellee

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before JOLLY, SMITH, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this 42 U.S.C. § 1983 case, the plaintiffs seek to impose municipal liability on Harris County, Texas, for the death of their family relative who was killed by a deputy sheriff who was allegedly engaging in unconstitutional excessive force during an arrest. They allege the County is liable for the deputy's unconstitutional acts under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the Harris County Sheriff's failure to thoroughly investigate officer-involved shootings created in the department an expectation of impunity for the use of excessive deadly force.

After a ten-day trial, the jury could not reach a verdict on the threshold issue, whether the deputy sheriff used excessive force. Instead of granting a new trial on the issue of excessive force, the district court granted judgment as a matter of law in favor of Harris County on the grounds that, irrespective of excessive force, the evidence was insufficient to establish the County's liability for Wilkinson's actions. Harrison's family appeals. After careful review of the evidence, we affirm.

I.

The underlying facts are disputed. The parties agree that on May 16, 2004, at approximately 1:20 a.m., Deputy Sheriff William Wilkinson stopped a vehicle driven by Hiji Harrison, and that during the course of that traffic stop Wilkinson shot Harrison once in the back and three times in the face. The parties disagree as to whether the shooting was excessive to Wilkinson's need to protect himself.

At trial Wilkinson testified that he stopped Harrison because he was speeding. According to Wilkinson, Harrison consented to a search of the vehicle. During his search, Wilkinson found a pistol on the floor board. Leaving the pistol there, he returned to the patrol car, where he had secured Harrison, and told him that he was under arrest. Wilkinson instructed Harrison to turn around in the seat and extend his arms behind his back so that he could be handcuffed. Harrison complied initially, but after his first hand was cuffed, a struggle followed. Wilkinson testified that Harrison used his free hand to pull Wilkinson into the backseat, then began to "fish and grab" for a gun. Wilkinson testified that because he feared for his life, he shot Harrison in the back. Fearing Harrison would arise and come after him, Wilkinson shot him three more times in the face, and held him at gunpoint until backup arrived.

Harrison's family argued to the jury that this testimony was materially inconsistent with the evidence. They pointed out that although Wilkinson

claimed Wilkinson shot Harrison while he was in the backseat of the patrol car, investigators recovered no gunpowder residue from the backseat, and the position of the shell casing suggested Wilkinson fired his gun while standing outside the car. The family also showed that Harrison's autopsy report indicated no bruising or other injury that would suggest a struggle.

The family argued that the County was liable for Wilkinson's actions because, they alleged, the Sheriff's failure to thoroughly investigate officer-involved shootings created in the department an expectation of impunity for the use of excessive deadly force. In support, the family called experts to testify that a pattern of inadequate investigations reflected an unwritten policy of under-investigating officer-involved shootings. One of those experts, Dr. David A. Klinger, connected the inadequate investigations to subsequent officer shootings, opining that people at the "bottom of an organization" tend to break institutional rules if the rules are not enforced.

As we have noted, the trial lasted ten days. After the jury had heard the family's evidence, the County moved for judgment as a matter of law on the issue of its liability for Wilkinson's alleged actions. That motion was denied. In due course, the case was submitted to the jury which, after six days of deliberation, informed the court that it could not reach a verdict on the threshold issue, whether Wilkinson had used excessive force. The district court then granted the County's renewed motion for judgment as a matter of law, holding that, although the evidence was sufficient to establish that Wilkinson used excessive force, it was insufficient to establish the County's liability for Wilkinson's actions. The family appeals.

## II.

At the outset we need to understand the precise theory of liability asserted against the County.[1] The arguments in the family's briefs are wide-ranging and the dots are not always connected, but the following salient points can be gleaned from the allegations: that the Sheriff inadequately investigates officer-involved shootings; that, after a cursory investigation, he then improperly delegates to the Harris County District Attorney's office the responsibility to investigate the conduct of the officers who were involved in shootings, with the tacit understanding that if no criminal indictment issues, the officer would not further be investigated or disciplined; that as a result of this improper "delegation," the Sheriff abdicated his responsibility to investigate to conclusion officer-involved shootings; that the Sheriff's hands-off approach created in the department the understanding that officers would be immune from discipline for the use of excessive deadly force; and, finally, that this understanding was the moving force causing Wilkinson's reckless use of deadly force on the night in question.

---

[1] On appeal, the family does not reurge two theories of liability it urged below. The family had argued that the County was liable for Wilkinson's actions because the Sheriff failed to supervise Wilkinson and, secondly, ratified Wilkinson's misconduct. The district court held that the evidence was insufficient to hold the County liable on the basis of either of those claims. Although the County has defended the district court's judgment on the failure to supervise and ratification claims in its briefs on appeal, the family has not appealed its ratification claim. The claim therefore has been abandoned. The family also has abandoned its failure to supervise claim; although their briefs allege troubling facts that they argue reflect the County's "practice of never disciplining Deputy Wilkinson," they cite no authority for failure to supervise liability, and indeed have not asked us to review that ruling. Accordingly, under Federal Rule of Appellate Procedure 28, we deem any argument as to the failure to supervise claim abandoned. *See* FED. R. APP. P. 28(a)(9)(A) (argument must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

This is a suit against the County only, but because the County's liability is premised on the Sheriff's official actions we refer to the County and Sheriff interchangeably.

We understand the family's allegations, although multiple, to be aimed at a focused policy claim: that it was the Sheriff's official policy to forgo a thorough investigation of officer-involved shootings, and concomitantly to ignore whether officer discipline was required in these situations.

In granting the County's Rule 50 motion, Judge Atlas, in an extended and thoroughly considered opinion, assumed that the family's evidence was sufficient to establish the existence of this alleged official policy. The judge concluded, however, that there was no evidence that Wilkinson himself had personal knowledge of the alleged policy, nor that the alleged policy was so widely known that it created in the department an expectation of impunity for the use of excessive deadly force, and therefore the evidence was insufficient to establish that the alleged policy was the moving force behind Wilkinson's actions on the night in question.

### III.

Before we review the district court's judgment, we will first set out the standard of review and provide an overview of the law applicable to § 1983 claims of municipal liability.

We review the district court's Rule 50 judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002). Federal Rule of Civil Procedure 50(a) authorizes the entry of judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." In our review here we ask whether there is "a conflict in substantial evidence on each essential element" of the family's claim against the County such that a reasonable jury could find in their favor. *Anthony*, 284 F.3d at 583 (citation omitted).

5

The principles of municipal liability under § 1983 are well-established. A municipality is not liable under § 1983 on the theory of respondeat superior, *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978), but instead only for acts that are directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To hold a municipality liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the muncipality's policymaker was the moving force behind, or actual cause of, the constitutional injury. *Id.* The official policy itself must be unconstitutional or, if not, must have been adopted "with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004); *see also Piotrowski*, 237 F.3d at 579.

Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). A policy is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003).

Although an official policy can render a municipality culpable, there can be no municipal liability unless it is the moving force behind the constitutional violation. *Piotrowski*, 237 F.3d at 580 ("In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional

6

deprivation.") (citing *Monell*, 436 U.S. at 694). In other words, a plaintiff must show direct causation, i.e., that there was "a direct causal link" between the policy and the violation. *Id.; see also Johnson*, 379 F.3d at 310 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) ("must be more than a mere 'but for'")).

A plaintiff must also show that, where the official policy itself is not facially unconstitutional, it was adopted "with 'deliberate indifference' as to its known or obvious consequences.'" *Johnson*, 379 F.3d at 309; *see also Piotrowski*, 237 F.3d at 579. Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992); *see also Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000).

Of the moving force and deliberate indifference elements of municipal liability, we have stressed: "These requirements must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997)).

Like the district court, we will assume a constitutional violation and an official policy; that is, for purposes of our decision today, we assume that Wilkinson used excessive force, and that it was the Sheriff's official policy to cede a thorough investigation of officer-involved shootings to the District Attorney, and correspondingly to abstain from further officer discipline in such cases. We also assume, for the purposes of this appeal, that the alleged policy was adopted with deliberate indifference to its known or obvious consequences, that is, that it would spawn reckless police arrests in violation of the Constitution. Therefore the only question we will decide is whether, on the basis of the evidence

7

presented, viewed in the light most favorable to the family, a reasonable jury could find the alleged policy was the moving force behind Wilkinson's actions. We conclude that it could not.

IV.

Because we assume the existence of an official policy, we look only for evidence to directly connect, or causally link, that policy to Wilkinson's conduct on the night in question. To show that the alleged policy was the moving force behind Wilkinson's use of excessive force, the family was required, at a minimum, to adduce evidence that Wilkinson understood that it was the Sheriff's official policy only to cursorily investigate officer-involved shootings and consequently not to discipline for this conduct.

Wilkinson testified only that he was aware that at some point in these matters the District Attorney investigated officer-involved shootings; his testimony, however, went no further.[2] He did not indicate that he was aware that the Sheriff abandoned further investigation and discipline for officer-involved shootings. Thus, nothing in Wilkinson's own testimony suggested his actual personal knowledge of the Sheriff's policy (a policy which the family has alleged and we have assumed), of pretermitting a thorough investigation and discipline in officer-involved shootings.

Thus, to show that the policy was the cause of Wilkinson's use of excessive force, the family was required to establish Wilkinson's knowledge of the policy through other means. To that end, the family sought to establish that a policy of not conducting a thorough investigation of officer-involved shootings was so widely known that it created in the department an expectation of impunity for the use of excessive deadly force, and Wilkinson's personal knowledge reasonably

---

[2] The only policy asserted by the family that the Sheriff acknowledges is that officer-involved shootings were ultimately turned over to the District Attorney for his review and appropriate handling.

could be assumed. To establish that the policy was widely known, the family relied exclusively on the expert testimony from Dr. David A. Klinger, a criminologist, that line officers tend to break institutional rules if they are not enforced. Dr. Klinger testified that of the 36 investigations of Harris County officer-involved shootings he personally reviewed, a "substantial number" fell below investigatory standards. He then sought to connect those substandard investigations to subsequent officer unjustified shootings by opining that established sociological theory suggested that informal networks of communication serve to inform people at the "bottom of the organization" of what kinds of conduct are permissible. Dr. Klinger's testimony thus sought to establish that the department's deputies would have known that the use of deadly force was not thoroughly investigated and disciplined and, consistent with his theory, would have broken rules governing the use of force.

The family argues that on the basis of Dr. Klinger's testimony, a reasonable jury could find that a policy of avoiding thorough investigation of officer-involved shootings was so widely known among the department's deputies that Wilkinson's personal knowledge of the policy could be assumed. After a thorough review, we do not find that this testimony supplies the direct causal link to Wilkinson's use of excessive force, because it simply does not connect Dr. Klinger's general theory to Wilkinson's knowledge that the Sheriff had a lax investigation and discipline policy.

The district court accepted Dr. Klinger's expert testimony to the extent it sought to establish that, generally, line workers will break rules if they are not enforced. But the district court expressly forbade Dr. Klinger from opining that Wilkinson had knowledge of the alleged policy, on the grounds that there was no evidence from which this fact could be established. The district court further rejected Dr. Klinger's testimony to the extent that it concluded that the alleged policy was widely known among the department's deputies; it reasoned that Dr.

Klinger had failed to offer any empirical evidence relating to the Harris County Sheriff's Department that could connect his general theory to the facts of this case. That is to say, no evidence was offered from which it properly could be inferred that it was common knowledge in the Sheriff's Department, through "informal networks of communication" (to use the expert's words), that the Sheriff's investigation and discipline for officer-involved shootings was lax.

"District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith Inc.*, 121 F.3d 984, 988 (5th Cir. 1997). We review a district court's rejection of expert testimony for abuse of discretion. *See, e.g., United States v. Wofford*, 560 F.3d 341, 346 (5th Cir. 2009). The record supports the district court's conclusion that Dr. Klinger offered no empirical evidence to connect his general theory to the Harris County Sheriff's Department; he never interviewed the department's deputies nor otherwise sought to collect evidence that might reveal whether informal networks of communication operated within the department. The district court did not abuse its discretion in rejecting those portions of Dr. Klinger's testimony that the alleged policy was widely known.

We conclude by holding that Dr. Klinger's general testimony simply does not supply the direct causal link between the alleged policy and Wilkinson's alleged use of excessive force. A reasonable jury could not find that the alleged policy was the moving force behind Wilkinson's alleged excessive force, when there was no evidence that Wilkinson had knowledge of such policy.

## V.

Having concluded that the family's evidence failed to satisfy an essential element of municipal liability, we agree with the district court that the County was not liable for Wilkinson's conduct. The district court's judgment is therefore

AFFIRMED.