United States Court of Appeals
Fifth Circuit

**F I L E D**

December 2, 2009

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 09-40310
Summary Calendar

HERIBERTO TAMEZ, Individually and On behalf of the Estate of Daniel
Tamez; MARIA TRINIDAD TAMEZ, Individually; APRIL GARZA, as Next
Friend of E.E.T., a Minor,

Plaintiffs - Appellants

v.

GERALD MANTHEY, Individually and in his Official Capacity; PEDRO H.
IBARRA, Individually and in his Official Capacity; POLICE CHIEF DANIEL
CASTILLO, Individually and in his Official Capacity; MIGUEL BERNAL,
Individually and in his Official Capacity; JAIME RODRIGUEZ, Individually
and in his Official Capacity; THE CITY OF HARLINGEN; RICK ELIZONDO,
Individually and in his Official Capacity,

Defendants - Appellees

Appeal from the United States District Court
For the Southern District of Texas
USDC No. 07-CV-00213

Before KING, STEWART, and HAYNES, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.

Daniel Tamez was a pretrial detainee of the City of Harlingen. He died while in the custody of the city from acute cocaine intoxication when a bag of cocaine that he swallowed before his arrest burst in his intestines. The Tamez Family then brought this suit under 42 U.S.C. § 1983 on Tamez's behalf, alleging that various police officers and prison officials were deliberately indifferent to Tamez's need for medical care. Appellees' moved for summary judgment on the Tamez Family's claim, and the district court granted their motion for summary judgment. The Tamez Family then appealed the district court's judgment. We AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

On January 18, 2006, at approximately 1:30 a.m., an officer from the Harlingen Police Department attempted to pull Daniel Tamez over after he disregarded a stop sign at high speed. Although Tamez initially pulled over, he decided to run from the police, causing multiple officers to pursue him for approximately two and a half miles. The officers eventually caught Tamez and arrested him.

After Tamez was arrested, he was transported to the Harlingen City Jail ("City Jail"). Tamez was aggressive and combative during the trip to the City Jail, and the transporting officers had to carry him into the jail. Once inside, Tamez was searched, and the officers discovered a short straw commonly used for cocaine in Tamez's pants but no drugs. The police then filled out an intake form for Tamez and asked him several health questions. In response to the officers' questions, Tamez told the officers that he was not on drugs, that he was diabetic, and that he was currently under the care of a physician. Later that same morning, during his appearance before a magistrate, Tamez appeared to be aware of what was occurring, and he immediately answered all the questions

R. 47.5.4.

2

asked by the judge. After his appearance before the judge, Tamez was returned to the City Jail. During this time, Tamez never advised any of his jailers that he felt ill, that he needed any medical treatment, or that he was injured.

That afternoon, defendants Jaime Rodriguez ("Detective Rodriguez") and Pedro Ibarra ("Detective Ibarra") transported Tamez to the Cameron County Carrizales-Rucker Detention Center ("County Jail"). While waiting to be booked, Tamez complained to one of the county jailers that he wanted to see a doctor because he felt tired. The jailer then summoned the county nurse on duty, who came and examined Tamez. While waiting for the nurse to arrive, Tamez informed the jailer and Detective Rodriguez that he might have a sexually transmitted disease ("STD").

Felipe Esquivel ("Nurse Esquivel") was the county intake nurse on duty on January 18, 2006, and he was the nurse that examined Tamez. County intake nurses are tasked with screening detainees brought to the County Jail to determine whether the detainees need a "medical clearance" before they can be incarcerated in the jail. The term "medical clearance" is an administrative term meaning that a detainee is medically cleared for incarceration. Nurse Esquivel testified that if a nurse finds anything abnormal with a detainee they reject the detainee pending medical clearance. Several officers and jailers testified that a medical clearance can be requested for many reasons, including a cold, a cough, cuts, or a hurt ankle or wrist; no evidence to the contrary was offered. Harlingen Police Chief Daniel Castillo ("Chief Castillo") testified that a rejection pending medical clearance does not by itself tell officers that a detainee is in need of immediate medical care. Nurse Esquivel also stated that, in addition to rejecting a person pending medical clearance, a nurse may call 911 or summon a County Jail physician if a detainee is in need of urgent or emergency medical care.

Nurse Esquivel did not find that Tamez was in need of either urgent or emergency medical care. He did, however, find that Tamez's pupils were maximally dilated, which was sufficient to reject him pending medical clearance. Nurse Esquivel then informed Detectives Ibarra and Rodriguez of Tamez's rejection. Nurse Esquivel told the detectives that Tamez had dilated pupils and needed to be medically cleared before the County Jail would incarcerate him. The nurse suggested that the detectives take Tamez to the Valley Regional Medical Center ("VRMC"), because it was the closest 24-hour facility with a physician on-call and an emergency room where Tamez could receive any necessary medical treatment before returning to the County Jail. Nurse Esquivel routinely referred every detainee pending medical clearance to VRMC.

During Nurse Esquivel's examination of Tamez, he asked Tamez whether he had taken drugs or was under the influence of drugs. Tamez denied taking drugs. If he had admitted that he was under the influence of drugs, Nurse Esquivel stated that he would not have rejected Tamez pending medical clearance; instead, he would have placed Tamez in isolation and treated him according to the county's drug and alcohol protocol.

Nurse Esquivel testified that he expected the detectives to take Tamez to the hospital immediately. However, he never testified that he told the detectives to take him to the hospital immediately or that there was any urgency to his instructions to take Tamez to the hospital.

The detective returned Tamez to the City Jail. The trip to jail was unremarkable. The detectives turned Tamez over to the custody of Harlingen jailers Rick Elizondo ("Jailer Elizondo") and Miguel Bernal ("Jailer Bernal"), who are both defendants in this action after informing the jailers that Tamez had been rejected pending medical clearance. After they turned Tamez over, the detectives no longer had any responsibility for Tamez.

Jailer Elizondo did not notice anything wrong with Tamez when he was returned to the City Jail, so he placed Tamez in his cell. Both Jailers Elizondo and Bernal checked on Tamez every twenty minutes. During their rounds, both jailers observed Tamez talking on the phone, which was a normal activity. Tamez did not sleep during their shift, and the jailers did not observe anything wrong with Tamez. Tamez never told either jailer that he was ill or that he needed to see a doctor. The only thing he requested was water, which was given to him. On Jailer Elizondo's final round, he again observed nothing out of the ordinary, and he told the jailers on the next shift that Tamez needed a medical clearance.

After an uneventful night, Jailer Estela Lozano ("Jailer Lozano") was on duty during which she checked on Tamez every twenty minutes. Tamez was asleep the first four times Jailer Lozano checked on him, and his clothes were not wet at the time. During a later round, Jailer Lozano noticed that Tamez's clothes were wet and that he was awake. When Jailer Lozano asked Tamez why his clothes were wet, he replied that he was hot. The wet clothes were the only "strange" thing that Jailer Lozano noticed about Tamez.

Jailer Lozano then asked Tamez why he had been sent back from the County Jail. Tamez responded that someone at the County Jail told him that he needed some blood work done before they would admit him. Jailer Lozano then asked one of her supervisors about obtaining a medical clearance for Tamez. Her supervisor called Harlingen police officer Arturo Gonzalez ("Officer Gonzalez") to take Tamez to the hospital. Tamez was able to exit his cell without any problem, and his trip to the hospital was without incident.

Officer Gonzalez drove Tamez to the Harlingen Medical Center ("HMC") to receive treatment. Nurse Marina Garza ("Nurse Garza") triaged Tamez at 9:42 a.m. on January 19, 2006. Tamez was restless during Nurse Garza's examination, and he told her that he had chest pains from working out and that

the pain was a one on a scale of one to ten. He also denied using drugs. Tamez was then examined by an emergency room doctor. Tamez was also sent to radiology for x-rays, and he returned from radiology at approximately 10:35 a.m.

Around 11:00 a.m., Tamez began suffering seizures. Medical personnel attempted to treat him and gave him medication. At 11:48 a.m. Tamez stopped breathing. Doctors and nurses attempted to revive Tamez for approximately fifty minutes, but he died at 12:29 p.m. After his death, an autopsy was performed. The autopsy found that Tamez died of acute cocaine intoxication. A clear, open baggy was found in Tamez's intestine, and the baggy tested positive for cocaine.

After Tamez's death, the Tamez Family brought this suit on Tamez's behalf under 42 U.S.C. § 1983, alleging that the Appellees were liable for Tamez's death. Appellees moved for summary judgment on the Tamez Family's § 1983 claim, and the district court granted their motion. This appeal followed.

## II. DISCUSSION

The Tamez Family contends that material fact issues concerning the various defendants' conduct require reversal of the summary judgment. In addition to defending the summary judgment, the Appellees contest the timeliness of the notice of appeal.

*1. Notice of Appeal*

Appellees argue that the appeal is untimely. The timely filing of an appeal is "mandatory and jurisdictional." *Bowles v. Russell*, 551 U.S. 205, 210 (2007). The question of timeliness turns on whether Texas Independence Day is a "legal holiday" for the purposes of Federal Rule of Appellate Procedure 26(a)(4).[1] We

---

[1] The district court entered judgment on January 30, 2009. Under Federal Rule of Appellate Procedure 4(a)(1)(A), a party must file a notice of appeal within thirty days of a district court's entry of judgment. Under Federal Rule of Appellate Procedure 26(a)(3), the last day of the thirty-day period cannot be a Sunday or a legal holiday. Thirty days from January 30, 2009 was March 1, 2009, a Sunday. The next day, March 2, was Texas

conclude that it is; the notice of appeal was timely filed. TEX. GOV'T CODE §§ 662.021, 662.003(b)(2).

*2. Motion for Summary Judgment*

The Tamez Family asserts that Appellees violated Tamez's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The district court granted summary judgment, finding that, based on the evidence before it, no reasonable jury could conclude that any of the defendants were deliberately indifferent to Tamez's need for medical care. We agree.

*A. Standard of Review*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing a grant of summary judgment, we view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir. 2006). However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). We may "affirm a grant of summary judgment on any grounds supported by the record and presented to the court below." *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).

---

Independence Day. The Tamez Family did not file the notice of appeal until March 3. Therefore, whether their notice of appeal is timely filed turns on whether Texas Independence Day is a legal holiday.

B.    *Selecting the Applicable Standard*

The appropriate standard to apply in analyzing constitutional challenges brought by pretrial detainees depends on whether the alleged unconstitutional conduct is a "condition of confinement" or "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). An "action is characterized properly as an 'episodic act or omission' case" when "the complained-of harm is a particular act or omission of one or more officials." *Id.* If a case falls under the "episodic act or omission" category, we apply the deliberate indifference standard. *Id.* at 54 (citing *Hare v. City of Corinth*, 74 F.3d 633, 649 n.4 (5th Cir. 1996) (en banc)). The Tamez Family's complaint that the Appellees refused to provide Tamez with immediate medical treatment qualifies as an "episodic act or omission," which triggers the deliberate indifference standard. *See id.*

C.    *Standard for Deliberate Indifference*

In order to establish a constitutional violation, the Tamez Family had to first show that each defendant acted with subjective deliberate indifference to Tamez's need for medical care. *Scott*, 114 F.3d at 54. For summary judgment purposes, then, the Tamez Family must raise a material fact issue concerning each Appellee's subjective deliberate indifference. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). To show subjective deliberate indifference, a plaintiff must present evidence: (1) that each defendant had subjective knowledge of "facts from which an inference of substantial risk of serious harm could be drawn," (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that the appellee "subjectively intended that harm occur." *Thompson*, 245 F.3d at 458-59. In other words, the Tamez Family must present evidence raising a material fact issue to the effect that the Appellees failed to act when they "were either aware or should have been aware[, because it was so

obvious,] of an unjustifiably high risk" to Tamez's health. *See Sibley v. Lemaire*, 184 F.3d 481, 489-90 (5th Cir. 1999) (finding summary judgment proper on the basis of qualified immunity when the evidence did not show that the appellees were aware of an "unjustifiably high risk" to a detainee).[2]

## D. *Applying the Deliberate Indifference Standard*

The Tamez Family claims that each appellee was deliberately indifferent to Tamez's need for medical care. The summary judgment evidence, however, does not support this assertion.

### *(1) Detectives Rodriguez and Ibarra*

The case against Detectives Rodriguez and Ibarra rises and falls on Nurse Esquivel's testimony, because nothing else in the record even potentially creates a fact issue in this regard.[3] On appeal, the Tamez Family's brief argues that

---

[2] Appellees did not move for summary judgment on the basis of qualified immunity. However, some issues overlap. *See Sibley*, 184 F.3d at 490. In making the determination of qualified immunity, the courts in cases like *Sibley* examine the same "deliberate indifference" standard addressed here, so we look to such cases for guidance. *See also Thompson*, 245 F.3d at 459 (explaining that examples of what is deliberate indifference "are relevant in assessing th scope of clearly established law [for qualified immunity purposes]," but a plaintiff responding to the defense of qualified immunity must also show "that all reasonable officials similarly situated would have then know that the alleged acts of the defendants violated the United States Constitution.")

[3] Other than the evidence from Nurse Esquivel, the Tamez Family points to the detectives' knowledge that Tamez was combative in the car; however, nothing about his behavior indicated a need for immediate medical attention. The record shows that the detectives also knew that Tamez was bipolar and that Detective Rodriguez knew that Tamez might have an STD. Although the detectives knew that Tamez was bipolar, they were not deliberately indifferent to any risk his condition might have posed, because they were not aware of the symptoms or characteristics of the illness or any other facts that would indicate some unjustifiably high risk to his health. *See Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) (finding that an officer who knew that a detainee might have a mental health issue was not deliberately indifferent because the other facts did not indicate a substantial risk of harm). While Detective Rodriguez knew that Tamez claimed to have an STD, he did not know what kind of STD or any other fact that would indicate that the STD posed a substantial risk of harm to Tamez's health. The record also does not show that the risk posed by Tamez's mental illness or STD was so obvious that the detectives should have known about the risk. The Tamez Family also argues that the detectives knew about Tamez's criminal history and that they knew he had a "short straw" on his person after he was arrested; the

Nurse Esquivel told the detectives to take Tamez to the hospital immediately. Were this so, the case would be different. But, in fact, Nurse Esquivel says no such thing. He said only that he *expected* logically that Tamez's next stop would be the hospital. He never testified that he conveyed this expectation to the detectives or that he in any way indicated any temporal urgency about his referral to the hospital to the detectives. The detectives' knowledge that Tamez had pupils that were maximally dilated and Tamez needed a medical clearance do not show that the detectives were aware of an unjustifiably high risk to Tamez's health, nor do they show that the risk to Tamez's health was so obvious that they should have inferred such a risk.[4] Because pupil dilation can mean "a lot of things,"according to the evidence, and because the undisputed evidence is that medical clearances were requested for even the most minor medical issues, nothing about these facts suggested a need for immediate attention. Even Nurse Esquivel's suggestion to take Tamez to VRMC does not show that Tamez was at a substantial risk of harm. The nurse did not tell the detectives to take Tamez there immediately, and he did not tell the detectives that Tamez was in need of urgent or emergency care. The record also shows that Nurse Esquivel always suggested VRMC for medical clearances regardless of how serious or minor the medical issue, which means the suggestion itself would not obviously indicate the existence of any substantial risk to Tamez's health.

Because the facts relied upon by the Tamez Family do not show that the detectives were aware, or should have been aware, of any substantial risk to

---

record, however, does not support their assertions.

[4] Nurse Esquivel testified in his deposition that pupil dilation could indicate "a lot of things." This testimony does not show that Tamez's pupil dilation obviously indicated the existence of some substantial risk to his health. The Tamez Family also make much of the fact that Nurse Esquivel considered Tamez's pupil dilation a "red flag." There is no evidence, however, that Nurse Esquivel told the officers that he considered Tamez's pupil dilation a "red flag."

Tamez's health, the district court was correct in granting the detectives' motion for summary judgment. *See Gibbs v. Grimmette*, 254 F.3d 545, 550 (5th Cir. 2001) (affirming district court's grant of summary judgment when the evidence did not show that the appellees acted with deliberate indifference to a detainee's right to medical care).

*(2) Jailers Bernal and Elizondo*

The Tamez Family argue that jailers Bernal and Elizondo knew that Tamez was at a substantial risk of harm because they were told he needed a medical clearance and that he had dilated pupils.[5] These fact, however, do not show that the jailers knew or should have known of a substantial risk to Tamez's health. *See Gibbs*, 254 F.3d at 550.

*E. Liability of the Remaining Appellees*

The record shows that the district court properly found that none of the detectives or the jailers violated Tamez's constitutional rights. This finding by the court also means that summary judgment was properly granted as to both Chief Castillo and Supervisor Gerald Manthey ("Supervisor Manthey"). The Tamez Family argues on appeal that Chief Castillo and Supervisor Manthey are liable under the theory of supervisor liability, but supervisor liability requires an underlying constitutional violation before such liability can be imposed.[6] *See Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997) ("[W]ithout an underlying

---

[5] The district court noted that the record presents a dispute over whether the jailers were told that Tamez's pupils were dilated. We assume for the purposes of reviewing the grant of summary judgment that the jailers were told that Tamez's pupils were dilated.

[6] Although the Tamez Family does not argue on appeal that Chief Castillo or Supervisor Manthey were themselves deliberately indifferent to Tamez's rights, the Tamez Family's complaint did assert that the chief and the supervisor were individually liable for Tamez's death. The record, however, does not show that Chief Castillo or Supervisor Manthey engaged in any conduct that constituted deliberate indifference. Therefore, the district court was correct in granting summary judgment on Tamez's claim that Chief Castillo and Supervisor Manthey were individually liable for violating his rights.

constitutional violation, there can be no § 1983 liability imposed on the school district or the individual supervisors."). Because no reasonable jury could find that either the detectives or the jailers violated Tamez's constitutional rights, there can be no supervisor liability imposed on Chief Castillo or Supervisor Manthey, so the district court properly granted them summary judgment.[7]

## III. CONCLUSION

The summary judgment record does not show that a reasonable jury could find that the Appellees were deliberately indifferent to Tamez's need for medical care. For this reason, the district court's grant of summary judgment is AFFIRMED.

---

[7] The Tamez Family also brought suit against the City of Harlingen, but no argument on appeal is made that the city is liable for any alleged violation of Tamez's rights. Even if such an argument had been made, municipal liability could not be established here, because the summary judgment evidence does not show that the any of the detectives or the jailers violated Tamez's rights. *See Becerra*, 105 F.3d at 1048.