**REVISED April 30, 2019**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2019

Lyle W. Cayce
Clerk

No. 18-40044

JOSE LUIS GARZA, individually and as Representatives of The Estate of
Jose Luis Garza, Jr., Deceased; VERONICA GARZA, individually and as
Representatives of The Estate of Jose Luis Garza, Jr., Deceased; CYNTHIA
LOPEZ, As Next Friend of Jose Ruben Garza, Minor Son,

> Plaintiffs - Appellants

v.

CITY OF DONNA,

> Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, DENNIS, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

On February 19, 2016, in a detention facility operated by the Donna
Police Department in Donna, Texas, Jose Luis Garza died by suicide. His estate
and survivors brought this suit under 42 U.S.C. § 1983 against a lone
defendant, the City of Donna, alleging violations of the Fourteenth
Amendment's Due Process Clause in the time leading up to, and immediately
following, Garza's suicide. The district court granted summary judgment to the
City, and we affirm.

No. 18-40044

I

In the early morning of February 19, 2016, officers of the Donna Police Department ("DPD") responded to a 911 call by Veronica Garza. Her call concerned her son, Jose Luis Garza, who was heavily intoxicated and arguing with his brother at the family's home. Officer Mario Silva was the first to respond at around 5:40 AM, with two other DPD officers soon joining. Veronica told officers that "I feared for his life" and "I'm afraid of him hurting himself." Officer Silva arrested Jose Luis Garza for "assault by threat" and transported him to DPD's facility. Though called a "jail," the district court clarified that it is "a short-term holding facility where—unlike a county jail or state prison—detainees do not stay long." Officer Silva booked Garza into the jail and placed him in a cell just after 6 AM. Officer Silva took no particular mental-health precautions when he brought Garza to the jail.

Garza was placed in a cell that contained a camera, and some time after 8 AM, he obscured the camera's lens. A DPD employee, Minerva Perez, was tasked with monitoring the jail's camera feeds under the jail's written policy. Her shift had begun at 6 AM, and during the morning, she answered 911 calls, one of her other duties. She did not notice that Garza had blocked the camera in his cell. She would later assert that, once jailers arrived to start their shifts, it was their responsibility to monitor the jail's inmates.

Those jailers were Esteban Garza—no relation to the decedent—and Nathan Coronado, who started their shifts at 8 AM. The jailers heard Garza banging on his cell door and making other noise to get their attention. It is disputed whether Garza's noisemaking prompted the jailers to check on him. The jail's written policy required hourly cell checks. The jail's log showed a check was done at 8:10 AM, though the check was not recorded

contemporaneously.[1] After that point, the jailers worked on signs that DPD's police chief, Ruben De Leon, directed them to put up in the jail. One read "Welcome to Donna Hilton,"[2] and another showed the logo of the Punisher, a comic-book character known for carrying out vigilante justice. Occupied with the signs, the jailers missed that Garza had hanged himself, and it took the chance arrival of agents from U.S. Immigration and Customs Enforcement (ICE) for Garza's suicide to be discovered. The ICE agents had arrived at 8:40 AM and found him at 8:49 AM. It was unclear how long he had been hanging.

Once Garza was discovered hanging, roughly two minutes passed before Lieutenant Rene Rosas and Captain Ricardo Suarez of DPD began performing CPR on him. During this time, emergency help was called, and it arrived in the form of Hidalgo County emergency medical technician Frank Tafolla. Rosas and Suarez had vigorously performed CPR in the interim, but they did not answer Tafolla's questions about what had happened to Garza. Consequently, Tafolla, who transported Garza to the hospital, lacked information to relay to hospital staff upon arrival. Garza was pronounced dead at the hospital at 9:12 AM.

This lawsuit against the City of Donna via 42 U.S.C. § 1983 followed. Garza's estate, mother, and son alleged violations of due process under the Fourteenth Amendment in the hours leading up to Garza's suicide and in the moments that followed. Their suit called five aspects of the events of February 19 into question, each implicating the actions of different DPD employees: Officer Silva, the arresting officer who booked Garza into the jail; Minerva

---

[1] Jailer Garza added the 8:10 AM check to the jail's cell-check log after Garza's death and after the Texas Rangers concluded their post-incident investigation. The actual occurrence of the check is thus a sharply contested fact issue.

[2] Appellants interpret the "Donna Hilton" sign as a reference to the notorious Vietnam POW camp, the so-called "Hanoi Hilton."

No. 18-40044

Perez, the employee allegedly responsible for watching the camera monitoring Garza's cell; the two jailers, Esteban Garza and Nathan Coronado, who were present but did not discover Garza's suicide; the two senior DPD officers, Lieutenant Rosas and Captain Suarez, who performed CPR on Garza but allegedly did not relate information to Tafolla, the EMT; and the police chief, Ruben De Leon, whose instruction to install the "Donna Hilton" and Punisher signs had allegedly occupied the two jailers' attention that morning. The district court rejected each proposed basis for municipal liability and granted summary judgment to the City, from which this appeal arises.

II

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's decision de novo, applying the same legal standard used by the district court. *Hyatt v. Thomas*, 843 F.3d 172, 176–77 (5th Cir. 2016). We view all evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

III

"The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). These rights include the right to medical care, *Sanchez v. Young County, Tex.*, 866 F.3d 274, 279 (5th Cir. 2017), and the right to protection from known suicidal tendencies, *Flores v. County of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997).

4

No. 18-40044

A municipality may be liable under 42 U.S.C. § 1983 for the violation of these rights. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission. *Hare*, 74 F.3d at 644. Cases of the former are attacks on "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* In cases of the latter, "the complained-of harm is a particular act or omission of one or more officials," and "an actor usually is interposed between the detainee and the municipality." *Scott v. Murphy*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc).

Appellants presented a conditions theory and numerous episodic-act theories to the district court, all of which were rejected. We take each in turn.

A

In a case challenging conditions of confinement, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539. Our court has said that a condition may take the form of "a rule," a "restriction," "an identifiable intended condition or practice," or "acts or omissions" by a jail official that are "sufficiently extended or pervasive." *Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 468 (5th Cir. 2015) (quoting *Duvall v. Dallas County, Tex.*, 631 F.3d 203, 207 (5th Cir. 2011)). Per *Bell*, such condition must be "not reasonably related to a legitimate governmental objective" and must cause the inmate's constitutional deprivation. *Id.*

Appellants' conditions theory centers on the signs that Ruben De Leon, DPD's police chief, ordered installed in the jail. Those signs, as noted, bore the

message "Welcome to Donna Hilton" and the Punisher logo, respectively, and Jailers Garza and Coronado were assembling them at the critical time on February 19. Appellants view the Donna Hilton sign as "mockingly invok[ing] the torture of POWs." Donna officials venture a positive interpretation of the sign. De Leon said he "wanted buy in from the jailers and the staff to remember that we're here to serve – the people who come in, some people call them prisoners. I call them customers." Robert Calloway, a Texas Ranger who investigated Garza's death, saw it as a reference to the Vietnam POW camp, as Appellants do.

Appellants view the Punisher logo as "favorably advocat[ing] vigilante violence." At summary judgment, Appellants argued at length for a "link between Punisher imagery and abusive police behavior." Among other sources, they relied on a dissenting opinion in a recent Eighth Circuit case, which, citing Wikipedia, explained that the Punisher was an "antihero" figure "created by Marvel Comics in 1974 as an antagonist to Spider-Man," who "considers killing, kidnapping, extortion, coercion, threats of violence, and torture to be acceptable crime fighting tactics." *Stitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 472 n.9 (8th Cir. 2010) (Lange, J., dissenting).

In Appellants' view, the signs, taken together, announce an "official policy of prisoner mistreatment" or "official encouragement of intentional mistreatment of detainees." They argue that the signs should thus be categorized as a "condition" of the confinement to which Garza was subjected. The signs "served no valid governmental purpose," and their installation caused Garza's constitutional deprivation because it preoccupied Jailers Garza and Coronado to the detriment of their core duties.

The district court declined to consider Appellants' suit as a conditions-of-confinement case. It cited several similar jail-suicide cases that our court elected to treat as episodic-act cases, rather than conditions cases. *See*

No. 18-40044

*Anderson v. Dallas County, Tex.*, 286 F. App'x 850, 858 (5th Cir. 2008); *Flores*, 124 F.3d at 738. It applied our court's rule that theories in which a particular actor is "interposed" between the injured party and the municipal defendant are properly treated as episodic-act cases.[3] All of Appellants' theories ultimately turn on acts or, more often, omissions by DPD staff, making this an episodic-act case. The theory of the distracted jailers, for instance, turns on the jailers' alleged omission of required cell checks.

Appellants' conditions theory is an effort to fit a square peg into a round hole. Prior conditions cases have concerned durable restraints or impositions on inmates' lives like overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation, or excessive heat. *See Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017) (heat); *Scott*, 114 F.3d at 53 & n.2 (collecting other examples). The import of the Donna jail's signs is too nebulous to amount to an official rule or restriction, and the signs do not operate as a continuing burden on inmate life in the way that dangerously high temperatures or overcrowded cells do. As such, the district court was correct to reject Appellants' conditions theory.

B

To establish municipal liability in an episodic-act case, a plaintiff must show "(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and

---

[3] The district court did go a step beyond our precedent by asserting that our court "uniformly" holds that jail-suicide cases are to be decided on an episodic-act basis. In a recent case, we allowed that a jail suicide might give rise to a conditions theory. *Sanchez*, 866 F.3d at 279. As we explained, "plaintiffs can bring a pretrial detainee case, whether or not it ultimately involves suicide, under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement." *Id.* at 279 n.3. Because the district court in that case had not considered that possibility, we remanded with instructions to do so. *Id.* at 279.

No. 18-40044

maintained with objective deliberate indifference." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008) (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528–29 (5th Cir. 1999)).

The district court's analysis focused on the first prong of the episodic-act framework as applied to each employee whose conduct Appellants put in question, scrutinizing the employee's knowledge and state of mind. The district court's formulation of "subjective deliberate indifference" was central to its rulings. The district court defined "subjective deliberate indifference" as follows: "a plaintiff must show that public officers were [1] aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn; [2] that they actually drew the inference; and [3] that their response indicates subjective intention that the harm occur." The district court drew this quote from *Sanchez v. Young County, Tex.*, 866 F.3d 274, 280 (5th Cir. 2017). The third element, "subjective intention that the harm occur," recurs in the district court's analysis,[4] and it is the object of Appellants' criticism.

The district court's "intention" requirement, though taken from statements in decisions of our court, is contrary to the weight of our case law and to the Supreme Court precedent from which our cases flow. Our court has based its Fourteenth Amendment case law concerning pretrial detainees on the Supreme Court's Eighth Amendment precedent concerning prisoners. *See*

---

[4] *See Garza v. City of Donna*, 2017 WL 6498392, at *9 (S.D. Tex. Dec. 15, 2017) ("Silva's response (taking no special action to prevent Decedent from committing suicide) does not indicate a 'subjective intention that the [suicide] occur.'"); *id.* at *11 ("There is also no evidence that [Esteban] Garza's failure to intercede was motivated by a 'subjective intention that the [suicide] occur . . . .'"); *id.* at *12 ("Coronado's lack of special supervision or intervention does not indicate a subjective intention that Decedent commit suicide."); *id.* at *13 ("[A] fact finder could not reasonably infer that Perez's dereliction of her duty to monitor indicate subjective intention that Decedent commit suicide."); *id.* at *13 ("It is thus impossible to infer . . . that Ruben [De Leon] intended Decedent to kill himself . . . ."); *id.* at *14 ("The events *before* and *after* this thirty-second failure to administer CPR do not suggest Defendant's employees intended that Decedent die or otherwise suffer.").

No. 18-40044

*Hare*, 74 F.3d at 643–44 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). Among those borrowings is our understanding of subjective deliberate indifference. In *Farmer*, the Supreme Court distinguished that culpable mental state from negligence, on the one hand, and knowledge and intent, on the other: "While *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." 511 U.S. at 835 (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. The Court ultimately held that an official cannot be found liable "unless the official knows of and disregards an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

*Farmer* therefore provides the first two elements of the deliberate-indifference standard applied by the district court, but not its third, that there be a "subjective intention that the harm occur." This third element elevates the required showing beyond what *Farmer* directed to a level that *Farmer* expressly distinguished. The district court's cited authority for this element, *Sanchez v. Young County*, relied on *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 458 (5th Cir. 2001). *Thompson*, in turn, paraphrased *Hare v. City of Corinth*, in which our en banc court applied *Farmer* to pretrial detainees. In *Hare*, however, the phrase was no more than a passing remark in an extended admonition. The challengers had argued that pretrial detainees deserved more protection than convicted prisoners and were pushing for a less demanding

9

No. 18-40044

standard than *Farmer*'s deliberate-indifference test. Rejecting that separate, contested argument, our court quoted a Seventh Circuit decision and said:

> We share the concern of the Seventh Circuit that the *Farmer* standard not be transmuted into a negligence inquiry. "Deliberate indifference, *i.e.*, *the subjective intent to cause harm*, cannot be inferred from a prison guard's failure to act reasonably. It if it could, the standard applied would be more akin to negligence than deliberate indifference."

74 F.3d at 649 (emphasis added). No citation accompanied this quote, which appears to be taken from *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995), a decision that came shortly after *Farmer* and viewed *Farmer* as working no change in Seventh Circuit precedent. *Id.* That court fixed its error the next year. *See Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996) ("To the extent that any language in our prior cases may have suggested that a plaintiff inmate making a deliberate indifference claim must establish that prison officials intended the harm that ultimately transpired, those statements do not accurately state the law in this circuit post *Farmer v. Brennan*.") (citing *Gibbs*, 49 F.3d at 1207).

Though "subjective intention" and its variants have occasionally appeared in our decisions beyond the aforementioned instances,[5] far more

---

[5] *See Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) ("subjectively intended that harm to occur"); *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) ("subjectively intended that harm occur"); *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003) ("subjective intent to cause harm"); *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000) ("subjective intent to cause harm"). *Wagner* relied on the same remark in *Hare* as *Thompson* had, and *Mace* followed *Wagner*; *Tamez* followed *Thompson*, and *Brown* then followed *Tamez*.

In these cases, unlike in the district court's decision here, the "subjective intent" prong has typically not played a central role. In *Brown*, the interlocutory posture did not confer jurisdiction to review the factual record of deliberate indifference. *See* 663 F.3d at 250–51. In *Tamez*, the defendants were not even aware of the risk of harm, much less indifferent or purposeful regarding that risk. *See* 589 F.3d at 771. In *Thompson*, the court's rulings as to two defendants turned on the existence of clearly established law for qualified immunity purposes, while the ruling as to the third turned on the objective reasonableness of her conduct, not her state of mind. *See* 245 F.3d at 460–64. In *Sanchez*, deliberate indifference

often we adhere to *Farmer*'s formulation: "the official knows of and disregards an excessive risk to inmate safety." 511 U.S. at 837. *See, e.g.*, *DeLaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018); *Perniciaro v. Lea*, 901 F.3d 241, 257 (5th Cir. 2018); *Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756, 759 (5th Cir. 2018); *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017); *Hyatt*, 843 F.3d at 179; *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015); *id.* at 684 (Jones, J., dissenting); *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc); *Estate of Henson*, 795 F.3d at 464; *Brumfield*, 551 F.3d at 331; *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000); *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999); *Downey v. Denton County, Tex.*, 119 F.3d 381, 385 (5th Cir. 1997); *Hare*, 74 F.3d at 648–49 (en banc). In this line of cases, which includes en banc decisions two decades apart,[6] none requires proof that officials subjectively intend that the harm occur. The case law of the other circuits adheres to *Farmer* and hence does not require a showing of subjective intent either.[7]

---

was one of four grounds on which the panel majority rejected the plaintiffs–appellants' municipal liability claim. *See* 866 F.3d at 280–81. While "subjective intent" appeared in the definition of deliberate indifference, it did not figure expressly in the court's analysis of the facts. *See* 866 F.3d at 280. *But see Mace*, 333 F.3d at 626 (looking for evidence "indicating that the [defendant] intentionally delayed driving [an] ambulance in order to cause harm"); *Wagner*, 227 F.3d at 325 (considering whether the facts could show that "defendants intended to harm" the decedent in the case).

[6] However one might square the passing remark in *Hare* with the standard that case announced, our 2015 en banc decision in *Williams v. Hampton* was unambiguous. The majority and dissenting opinions agreed that *Farmer*'s "knows and disregards" formulation governed. *See* 797 F.3d at 281 (Owen, J.) (majority opinion); *id.* at 301 (Graves, J., dissenting).

[7] *See Leite v. Bergeron*, 911 F.3d 47, 52 (1st Cir. 2018) ("knows of and disregards"); *Walker v. Schult*, 717 F.3d 119, 125 (2nd Cir. 2013) ("know of, and disregard"); *Palakovic v. Wetzel*, 854 F.3d 209, 225 n.17 (3rd Cir. 2017) ("knew or was aware of and disregarded"); *Thompson v. Virginia*, 878 F.3d 89, 107 (4th Cir. 2017) ("knew of and disregarded"); *Guertin v. Michigan*, 912 F.3d 907, 926 (6th Cir. 2019) ("knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference

No. 18-40044

Though we cannot fault a district court that followed statements we have previously made, we cannot endorse an analysis that departed from controlling Supreme Court and Fifth Circuit law. We can, however, "affirm on any ground raised below and supported by the record, even if the district court did not reach it." *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 810 (5th Cir. 2016).

As explained above, to establish municipal liability based on an employee's episodic act or omission, a plaintiff must show the violation "resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Brumfield*, 551 F.3d at 331. A policy or custom may be attributed to a municipal defendant through the identification of a final policymaking authority. *See Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 407 (1997); *City of St. Louis v. Propotnik*, 485 U.S. 112, 123 (1988). Identification of an official as a final policymaking authority is a question of state and local law. *Propotnik*, 485 U.S. at 124. We have previously found that Texas police chiefs are final policymakers for their municipalities, and it has often not been a disputed issue in the cases. *See, e.g.*, *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010) (concluding, from promulgation of "General Orders" by police chief, that he was final policymaking authority for "internal police policy"); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847–48 (5th Cir. 2009) (not disputed); *Lewis v. Pugh*, 289 F. App'x 767, 776 (5th Cir. 2008) (not disputed).

---

toward the individual's rights"); *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("knew of and consciously disregarded"); *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) ("knew of and deliberately disregarded"); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) ("knows . . . and disregards"); *Vasquez v. Davis*, 882 F.3d 1270, 1275 (10th Cir. 2018) ("knew of and disregarded"); *Mitchell v. Nobles*, 873 F.3d 869, 876 (11th Cir. 2018) ("(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence"); *Acosta v. Nelson*, 561 F. App'x 4, 5 (D.C. Cir. 2014) ("knows of and disregards").

12

Assuming Ruben De Leon was a final policymaking authority for the City, Appellants must show a policy or custom of his that was the moving force for the episodic acts or omissions of DPD employees. *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009). Policy can take the "form of written policy statements, ordinances, or regulations." *Id.* It can be "a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). It can take the form of a failure to train, provided that the failure is "closely related to the ultimate injury" and not just attributable to a particular officer's shortcomings. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91 (1989). It can also be a decision to adopt a course of action to handle a particular situation, if made by an authorized decisionmaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

Appellants do not attribute the actions of the arresting officer, Silva, or the senior officers who performed CPR, Rosas and Suarez, to any particular policy or custom. What they argue for Silva, Rosas, and Suarez is that De Leon's order to post the "Welcome to Donna Hilton" and "Punisher" signs announced an official policy of detainee mistreatment. The import of the signs is too general and inexact for the signs to constitute the sort of specific directive required for municipal liability, and it is too nebulous to constitute a moving force. The episodic acts or omissions of these employees therefore cannot be attributed to the City.

Appellants say Minerva Perez displayed "utter confusion" about her responsibility to monitor the jail's camera feeds, invoking the failure-to-train principles articulated by *City of Canton v. Harris*. "Under *Canton*, when a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate

13

indifference.'" *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 388). Deliberate indifference may be inferred either from a pattern of constitutional violations or, absent proof of a pattern, from "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Id.* (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003)). The latter inference "is possible only in very narrow circumstances" because we have "generally reserved the single-incident method . . . for cases in which the policymaker provides no training whatsoever with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury." *Id.* at 625 & n.5 (quotations and citations omitted).

Appellants put forward no evidence of a pattern of violations stemming from deficient training, so their case depends on the single-incident method of demonstrating deliberate indifference. As we have emphasized, deliberate indifference may be inferred this way "only in narrow and extreme circumstances," and decisions by our court drawing the inference are rare. *Littell*, 894 F.3d at 627; *see also Pineda v. City of Houston*, 291 F.3d 325, 334–35 (5th Cir. 2002) (reiterating the rarity of this method's successful application). Appellants have not carried their burden here. The summary judgment record contains no evidence of the training that Perez did and did not receive, other than that De Leon had trained Perez. Moreover, the record has no evidence about the population that passes through the City's jail or about the jail's operations from which the possibility of recurring situations threatening to constitutional rights might be assessed. It is apparent that this record is inadequate to support a failure-to-train theory as to Perez.

Of the jailers, Esteban Garza and Coronado, Appellants note their preoccupation on February 19 with installing signs in the jail, to the detriment

of their job duties, and they attribute the jailers' distraction to the directive from De Leon to install the signs. It is true that a decision to adopt "a course of action tailored to a particular situation" by a municipal government's authorized decisionmaker may constitute an official policy. *Pembaur*, 475 U.S. at 483. But municipal liability arises only where the "*deliberate* choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question.*" *Id.* at 483–84 (emphasis added). Nothing in the record indicates that De Leon was aware of Garza's presence at the jail, much less that he instructed the jailers to disregard Garza in favor of installing the signs. It thus cannot be said that De Leon's directive was deliberate in the sense meant by *Pembaur* or that it was tailored to the particular situation of Garza's confinement. Consequently, it is apparent that the record cannot support municipal liability on this basis.

In sum, whatever we may think of the various DPD employees' actions on February 19, 2016, Appellants have not set forth evidence by which those actions might reasonably be attributed to the City. Accordingly, the City is entitled to judgment as a matter of law, making the district court's grant of summary judgment to the City the correct outcome on this record.

IV

For the foregoing reasons, we AFFIRM.