<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JIMMY JOSEPH VASQUEZ,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

JEANNE DAVIS, in her individual
capacity; BRIAN WEBSTER, in his
individual capacity; KATHLEEN
MELLOH, in her individual capacity;
MAURICE FAUVEL, in his individual and
official capacities; RICK RAEMISCH, in
his official capacity,

      Defendants - Appellees/Cross-
      Appellants,

and

KATHLEEN MARTORANO, in her
individual capacity,

      Defendant/Cross-Appellant,

and

GATBEL CHAMJOCK, in his individual
capacity,

      Defendant - Appellee.

Nos. 17-1026 & 17-1044

_____

**Appeals from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-01433-WJM-CBS)**

_____

Elisabeth L. Owen, Prisoners' Justice League of Colorado LLC, Denver, Colorado, for Plaintiff Vasquez.

Chris W. Alber, Senior Assistant Attorney General, Denver, Colorado, for Defendants Davis, Martorano, Webster, Melloh, Fauvel, and Raemisch.

Joseph P. Sanchez, Goodspeed & Merrill, Denver, Colorado, for Defendant Chamjock.
_____

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

In this 42 U.S.C. § 1983 action, Plaintiff Jimmy Vasquez, an inmate in the Colorado Department of Corrections ("CDOC"), contends that CDOC medical providers were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Vasquez specifically alleges that Defendants delayed treating him for the hepatitis C virus ("HCV"), resulting in his suffering life-threatening permanent liver damage. In appeal No. 17-1026, we AFFIRM the district court's decision to grant Defendants summary judgment, concluding Vasquez's claims against Defendants Davis, Webster, Melloh, and Chamjock are time-barred, and Vasquez failed to present sufficient evidence that Defendant Fauvel acted with deliberate indifference. In appeal No. 17-1044, we VACATE an injunction requiring the CDOC to test Vasquez's liver function every three months.

2

## I. BACKGROUND

Vasquez began serving a life sentence in the CDOC in 2004. At that time, he was diagnosed with HCV. HCV is transmitted primarily through blood-to-blood transfers by, for instance, sharing needles used for intravenous drug use or tattoos. While 75% to 80% of people with chronic HCV suffer no serious problems, the remainder, like Vasquez, suffer progressive liver damage from liver diseases such as cancer or cirrhosis. Cirrhosis, which is particularly relevant here, "is a progressive disease in which healthy liver tissue is replaced with scar tissue, eventually preventing the liver from functioning effectively." (Aplt. App. 609 ¶ 34.) Liver damage from HCV can progress slowly, taking up to two or three decades.

During the course of Vasquez's prison sentence, the treatment of HCV has evolved and improved. When he first entered prison in 2004, HCV was treated, with limited success, using the antiviral medications interferon and ribavirin. These medications could produce severe side effects—"many guys get very sick on" interferon and ribavirin, (id. 445)—and could not be used if the patient had "decompensated" liver cirrhosis. (Id. 270-71 ¶¶ 19, 21; 1157 ¶¶ 19, 21.) In 2011, medical providers began using other antiviral medications to supplement interferon and ribavirin, improving cure rates. In 2013, a new antiviral medication sovaldi was used with interferon and/or ribavirin. In 2014, harvoni became available to treat specific genotypes of HCV. Although these antiviral medications can cure HCV with increasing effectiveness, they do not reverse any resulting permanent liver damage.

3

These antiviral treatments for HCV are expensive, ranging from $40,000 to $160,000 per patient, depending on the length of treatment, and they do not immunize the patient from becoming re-infected through, for example, further sharing of needles for intravenous drug use. In light of this, the CDOC requires that an inmate take six months of drug and alcohol avoidance classes ("D&A classes") before becoming eligible for HCV treatment. Further, CDOC policy places the onus on the inmate both to request HCV treatment and to complete the requisite D&A classes.

When Vasquez was diagnosed with HCV in late 2004, CDOC officials gave him a two-page handout explaining HCV and the general treatment available at that time. Vasquez asked his case manager in March 2005 for assistance enrolling in D&A classes so that he could eventually be treated for HCV. At that time, however, there were no D&A classes available in the high security section of the CDOC's prison in Sterling, where Vasquez was housed. Even though CDOC policy was to transfer an inmate who needed D&A classes to a facility where those classes were offered, such transfers were subject to CDOC security determinations. In Vasquez's case, his case manager noted that she would check on the possibility of transferring Vasquez to another prison where he could attend D&A classes, but the record does not indicate whether the case manager ever checked.[1]

---

[1] Vasquez's case manager at this time was Defendant Kathleen Martorano. On appeal, Vasquez does not challenge the district court's decision to grant her summary judgment.

4

In May 2005, six months after Vasquez entered the CDOC, Defendant Jeanne Davis, a prison nurse, confirmed that Vasquez's HCV was chronic, and notified him that he was medically eligible for HCV treatment after he completed six months of D&A classes. Although Davis further informed Vasquez that he should "send a kite to medical" (id. 277 ¶ 57)—that is, send a written request to the prison medical clinic if he was interested in receiving treatment—Vasquez did not make such a request.

Vasquez did not seek to enroll in D&A classes again for another seven years. During that time, D&A classes became available to him. In 2008, because many inmates were having trouble enrolling in these classes, the CDOC relaxed the requirements for what qualified as D&A classes. In 2012 or 2013, CDOC reinstated its stricter requirements for D&A classes, but made those classes available to all inmates, including those housed in Sterling's high security wing. Vasquez indicates that he knew in 2010 that there were D&A classes available to him.

Beginning in August 2006, a series of CDOC physician's assistants, including Defendants Brian Webster, Gatbel Chamjock, and Kathleen Melloh, treated Vasquez for a variety of medical conditions. These Defendants were aware both that Vasquez had HCV and that he was beginning to show signs of liver damage. These signs included consistently high liver enzyme and ammonia levels in his blood. Based on his high ammonia levels, Defendant Webster diagnosed Vasquez with liver cirrhosis in June 2008, and spoke to Vasquez about his "worsening" liver condition resulting from his HCV (id. 222, 342). Webster prescribed Vasquez with medication to decrease the amount of ammonia in his blood. But Webster did not refer Vasquez for

5

D&A classes, mistakenly believing both that the prevailing antiviral treatment could not be used on patients who had already developed any degree of liver cirrhosis and that Vasquez's high security classification precluded him from participating in D&A classes. After 2008, Defendants Webster, Chamjock and Melloh continued to monitor Vasquez's condition and to treat his symptoms, including lowering his ammonia levels.

On January 14, 2012, Vasquez sought medical attention, reporting he had vomited blood. A day or two later, Vasquez requested assistance in enrolling in D&A classes. By this time, Vasquez knew that he had HCV, that progressive liver damage could result from untreated HCV, that his liver condition had been "worsening" for a number of years, and that to obtain treatment, he first had to complete six months of D&A classes. On February 6, 2012, Defendant Dr. Maurice Fauvel saw Vasquez for the first time, noted Vasquez's interest in receiving HCV treatment, discussed the treatment protocol with him "at length," and referred Vasquez to his case manager to enroll in available D&A classes. (Id. 261.) After several months of bureaucratic run-around, Vasquez began attending D&A classes in July 2012, and completed those classes in January 2013.[2]

A week after Vasquez began these classes, in July 2012, Dr. Fauvel discussed with Vasquez the possibility of HCV treatment, consulted with CDOC medical

---

[2] The CDOC later determined that, through no fault of Vasquez, these classes did not qualify as the required D&A classes, but eventually the CDOC waived any concern about his having completed the appropriate classes.

administrators about Vasquez, and then ordered a liver biopsy, which was the next step in determining whether Vasquez qualified medically for the prevailing antiviral HCV treatment. The liver biopsy had to be approved by CDOC's third-party medical care payor, which appears to have delayed indefinitely Dr. Fauvel's request.

In May 2013, Vazquez began vomiting large amounts of blood and was rushed to Denver for surgery to repair hemorrhaging varices in his esophagus. Such varices can be caused by liver cirrhosis. According to Vasquez, at this time the doctors in Denver told him that, because of the extent of damage to his liver, he did not qualify medically for then-available antiviral HCV treatments. When he returned to the Sterling prison in June 2013, Vasquez again asked Dr. Fauvel for HCV treatment and filed several grievances complaining of the lack of HCV treatment.

In May 2014, having exhausted his administrative remedies,[3] Vasquez, acting pro se, filed this 42 U.S.C. § 1983 lawsuit. The district court appointed Vasquez counsel. While this case was pending, the CDOC, in 2016, approved Vasquez to be treated with a new antiviral regimen of sovaldi and ribavirin.

In this litigation, Vasquez seeks damages from several CDOC medical providers, alleging they were deliberately indifferent to his serious medical needs. The district court granted each of these Defendants summary judgment. In appeal

---

[3] Over Defendants' objection, the district court ruled that Vasquez adequately exhausted his administrative remedies as required under 42 U.S.C. § 1997e(a). Defendants do not challenge that ruling on appeal and the exhaustion of administrative remedies is not, in any event, a jurisdictional prerequisite, see Jones v. Bock, 549 U.S. 199, 211-12, 216 (2007) (holding exhaustion of administrative remedies under § 1997e(a) is affirmative defense).

No. 17-1026, Vasquez challenges those rulings, but only as to Defendants Davis, Webster, Chamjock, Melloh and Fauvel.  In appeal No. 17-1044, the State Defendants (all but Defendant Chamjock) challenge the district court's decision to enter, sua sponte, a permanent injunction requiring CDOC officials to test Vasquez's liver function every three months.  We have jurisdiction to consider these appeals under 28 U.S.C. § 1291.

## II. APPEAL NO. 17-1026

This court reviews de novo the district court's decision to award Defendants Chamjock, Davis, Webster, Melloh and Fauvel summary judgment, viewing the evidence in the light most favorable to Vasquez.  See Sylvia v. Glanz, 875 F.3d 1307, 1328 (10th Cir. 2017).  The district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

To recover damages from each of these Defendants under § 1983, Vasquez had to show that such Defendant personally participated in the alleged constitutional violation.  See Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007).  Here, Vasquez alleged that Defendants violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To recover as to a particular Defendant, Vasquez had to prove as to that Defendant both an objective and a subjective element of his claim.  See Al-Turki v. Robinson, 762 F.3d 1188, 1192 (10th Cir. 2014).

8

To prove the objective element of his deliberate-indifference claim, Vasquez had to show that his "medical condition was sufficiently serious to be cognizable under the [Eighth Amendment's] Cruel and Unusual Punishment Clause."  Id. at 1192 (internal quotation marks omitted).  Where, as here, the claim involves a delay in treatment, Vasquez had to show "that the delay resulted in substantial harm," a requirement that "may be satisfied by" a showing of "lifelong handicap, permanent loss, or considerable pain."  Id. at 1193 (internal quotation marks omitted).  To prove the subjective element of his claim, Vasquez had to show for each liable Defendant that such Defendant "kn[e]w of and disregard[ed] an excessive risk to [Vasquez's] health or safety."  Id. at 1192 (quoting *Farmer v. Brennan, 511 U.S. 825, 837* (1994)).

**A.  Vasquez's claims against Defendants Davis, Webster, Chamjock, and Melloh are time-barred**

**1. Vasquez's claims against these Defendants accrued by February 2012**

Vasquez filed this case on May 21, 2014.  The parties agree that, to be timely, Vasquez had to have filed suit within two years from the date his § 1983 Eighth Amendment claims accrued.  See Myers v. Koopman, 738 F.3d 1190, 1194 n.2 (10th Cir. 2013) (applying Colo. Rev. Stat. § 13-80-102(1)(a)).  See generally Wallace v. Cato, 549 U.S. 384, 387 (2007) (looking to relevant state's law for § 1983 limitations period).

Federal law, which governs when a § 1983 claim accrues, provides that Vasquez's claims accrued when he had "a complete and present cause of action"; that

9

is, when he could have filed suit and obtained relief. Id. at 388 (internal quotation marks omitted). In light of the objective and subjective elements of Vasquez's Eighth Amendment claims, those claims accrued when he "knew or had reason to know[,]" Mata v. Anderson, 635 F.3d 1250, 1253 (10th Cir. 2011), separately for each of these Defendants—Davis, Webster, Chamjock and Melloh—to be liable, that they had acted with deliberate indifference to a known risk to Vasquez's medical needs, and that his or her deliberate indifference resulted in a delay in treatment that caused Vasquez substantial harm. See Bauer v. City & Cty. of Denver, 642 F. App'x 920, 924 (10th Cir. 2016) (unpublished) (holding Eighth Amendment claim accrued when inmate knew he had been denied medical treatment and that he would lose his foot as a result).[4] The claim accrued once Vasquez knew Defendants' deliberate indifference caused him substantial harm, "even though the full extent of the injury is not then known or predictable." Wallace, 549 U.S. at 391 (internal quotation marks omitted).

Here, the deliberate indifference (if any) of these Defendants—Davis, Webster, Chamjock and Melloh—would have occurred more than two years before Vasquez filed this action. Defendant Davis's only contact with Vasquez was in 2004 and 2005. Defendant Webster last treated Vasquez in March 2009. Defendant Chamjock refilled Vasquez's prescriptions and saw him just a few times between May 2008 and May 2010. Melloh refilled Vasquez's prescriptions and ordered periodic lab tests in 2010, and saw Vasquez once, in January 2012.

---

[4] Though unpublished, we find Bauer's reasoning persuasive.

10

Vasquez's claims against these Defendants, therefore, cannot be timely unless he did not know, or have reason to know, that their deliberate indifference substantially harmed him until at least May 2012, two years before he filed this suit. The district court, however, correctly concluded instead that Vasquez knew he had been substantially harmed by no later than February 2012. By that time certainly (and likely at an even earlier time), Vasquez knew he had chronic HCV and that HCV could "eventually kill you" (Aplt. App. 530). Vasquez further knew that progressive liver damage was possible from HCV, and that since June 2008 his liver was "worsening . . . from HCV" (id. 222, 342). Vasquez also knew that, from June 2008 forward, he had to take prescription medication each day for his worsening liver. In addition, Vasquez knew that, in order to obtain HCV treatment, he needed to complete six months of D&A classes, but that when he tried to enroll in those classes in March 2005, he was unable to do so. A few days after seeking medical attention for vomiting blood in January 2012, Vasquez again began requesting to enroll in D&A classes in order to get HCV treatment.

Vasquez asserts that there is no evidence "that he understood the import of these things" because he is not a medical professional and "is severely intellectually limited." (Vasquez Br. 29.) But Vasquez's subsequent conduct belies that assertion. After requesting to enroll in D&A classes in January 2012, Vasquez met with Dr. Fauvel in February 2012; Fauvel noted Vasquez's interest in the D&A classes, discussed HCV treatment with Vasquez "at length," indicated Vasquez "understood," and referred Vasquez to his case manager to enroll in D&A classes. (Aplt. App.

11

261.)  When he ran into several bureaucratic snags to enrolling, Vasquez filed several grievances, asserting that he needed to enroll in the D&A classes in order to get "the treatment I need for hepatitis C. . . . because its [sic] been long enough" and apologizing "for the inconvenience but I need this treatment."  (Id. 835.)  In light of this evidence, the district court correctly held that Vasquez knew, certainly no later than February 2012, that any failure of Defendants Davis, Webster, Chamjock and Melloh to treat Vasquez's HCV had substantially harmed him, thereby triggering the two-year limitations period.[5]

### 2.  Continuing violation

Vasquez argues that, even if his Eighth Amendment claims against Defendants Davis, Webster, Chamjock and Melloh accrued in February 2012, the "continuing violation" doctrine saves those claims from being time-barred.  Vasquez's theory is that, even if his § 1983 claims against these four Defendants accrued in February 2012, the Eighth Amendment violation underlying his claims—the delay in treating his HCV—continued until he received he was finally treated for HCV in February 2016.

The continuing violation doctrine was developed in the Title VII employment law context, see Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994), and this court has not yet decided whether it should apply to § 1983 claims, see Colby v. Herrick, 849 F.3d 1273, 1280 (10th Cir. 2017) (assuming "[f]or the sake of argument" that

---

[5]  Vasquez has never asserted that the limitations period should be tolled because of mental or other disability or obstacle.

continuing violation doctrine applies to § 1983 claims, but concluding doctrine would not save time-barred claim in that case). We need not decide the question here, either, because even if we were to apply that doctrine, it would not save Vasquez's claims against Defendants Davis, Webster, Chamjock, or Melloh. That is because, as this Court has recognized it, the continuing violation "doctrine is triggered by continuing unlawful acts but not by continuing damages from the initial violation." Colby, 849 F.3d at 1280; see also Mata, 635 F.3d at 1253 (citing other Tenth Circuit cases). Said another way, the continuing violation doctrine, as we have defined it, would apply here only when a particular defendant allegedly committed wrongful acts within, as well as outside, the limitations period. See also Shomo v. City of New York, 579 F.3d 176, 183-84 (2d Cir. 2009). Here, none of these Defendants—Davis, Webster, Chamjock or Melloh—had any interactions with Vasquez within the two-year period preceding his filing this action. Even if we applied the continuing violation doctrine, then, it would not save Vasquez's claims against these Defendants.

## B. Vasquez failed to submit sufficient evidence that Defendant Fauvel acted with deliberate indifference

Vazquez's claim against Defendant Fauvel is different. Because almost all of Fauvel's interactions with Vasquez occurred within the two-year period immediately preceding his filing this suit, any substantial harm resulting from Fauvel's deliberate indifference as part of these interactions would support a timely claim against him. The district court, nevertheless, granted Fauvel summary judgment, concluding

13

Vasquez failed to present sufficient evidence from which a jury could find that Dr. Fauvel had subjectively acted with deliberate indifference. The record supports the district court's determination.

The subjective component of an Eighth Amendment claim "presents a high evidentiary hurdle to . . . [§ 1983] plaintiffs." Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006). To establish that Dr. Fauvel acted with deliberate indifference, Vasquez had to show that Fauvel both knew of a "substantial risk of serious harm" to Vasquez and acted in disregard of that risk. Farmer, 511 U.S. at 837. Deliberate indifference to such a risk requires more than a showing of negligence, see id. at 835, or even malpractice, see Self, 439 F.3d at 1230-33. Further, this "subjective component" of Vasquez's claim "is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." Id. at 1232. Here, there is no evidence that Dr. Fauvel acted with the required culpability to establish Eighth Amendment liability in treating Vasquez.

When Fauvel first saw Vasquez in February 2012, Vasquez had already been diagnosed with both chronic HCV and resulting liver cirrhosis. At their first meeting, Fauvel noted Vasquez wanted to enroll in D&A classes in order to receive HCV treatment, discussed that treatment with Vasquez "at length," and then referred Vasquez to his case manager to enroll in D&A classes. (Aplt. App. 434.) Once Vasquez was enrolled, Fauvel sought to facilitate Vasquez getting treatment for his HCV. But Fauvel had at least two related problems in facilitating treatment: First, there is no indication that Fauvel himself could authorize treatment; instead, HCV

14

treatment had to be authorized by a CDOC infectious disease committee. In light of that, Fauvel sought to complete the workup and other necessary steps before the committee could consider Vasquez for treatment. Second, Fauvel was not sure if Vasquez could qualify medically for HCV treatment in light of his cirrhosis. Fauvel, therefore, consulted with higher level CDOC administrators regarding Vasquez. Those administrators encouraged Fauvel to order a liver biopsy, which was needed for treatment approval and would indicate whether Vasquez's liver was already too damaged for treatment. Fauvel requested a liver biopsy August 15, 2012. However, Fauvel did not have authority to have the biopsy done, either; it had to be approved by the CDOC's third-party medical payor. And apparently Fauvel's request languished for a long time without any action.

Dr. Fauvel did not see Vasquez for almost a year after he requested the liver biopsy; Vasquez was seen during this time by other medical providers. In the meantime, Vasquez had to be rushed to Denver in May 2013, for surgery to repair his bleeding esophageal varices. For a time, recovery from this surgery took precedence over possibly treating Vasquez's HCV. Moreover, according to Vasquez, Denver doctors told him that he could no longer receive HCV treatment because his liver was so damaged. Several months later, another doctor apparently outside the CDOC saw Vasquez, but did not advocate treating his HCV.

At about this same time period, Vasquez was also diagnosed with multiple myeloma. For a while, evaluation and treatment of this condition took precedence. Nonetheless, when Fauvel saw Vasquez in June 2013, after Vasquez returned from

15

Denver, Fauvel emailed the CDOC "Hep C committee" to see if Vasquez was on the committee's schedule and to determine if "everything [is] completed for the Hep C treatment." (Id. 427.) On several later occasions, Fauvel attempted to correspond with upper level CDOC medical administrators about possible HCV treatment for Vasquez. In addition, Fauvel continued to see Vasquez every few weeks, monitored his liver condition and treated his ammonia levels, among other symptoms, through the time Vasquez initiated this litigation.

A jury could not find from this record that Dr. Fauvel acted with deliberate indifference to a serious risk to Vasquez's health. Instead, the record establishes that that Fauvel exercised his medical judgment to provide Vasquez with medical care within the limitations imposed by Vasquez's health and CDOC treatment restrictions.[6]

### III. APPEAL NO. 17-1044

While this litigation was pending, the CDOC approved treating Vasquez with the antiviral medication sovaldi. At that same time, Vasquez sought a preliminary injunction ordering the CDOC to treat him, instead, with another drug, harvoni. During a hearing on the motion for the preliminary injunction, evidence from both sides indicated that sovaldi, and not harvoni, was the appropriate antiviral medication

---

[6] Importantly, Vasquez did not challenge the CDOC policies pertaining to HCV, nor did he sue the CDOC officials responsible for creating or enforcing such policies, so that is not before us. See Hilton v. Wright, 673 F.3d 120, 124 (2d Cir. 2012) (addressing inmates' claim challenging department of corrections' policy conditioning HCV treatment on inmates' participation in substance abuse programs); Roe v. Elyea, 631 F.3d 843, 847 (7th Cir. 2011) (upholding jury's verdict that prison policy regarding treatment of HCV was deliberately indifferent).

to treat Vasquez's HCV. On that basis, the district court denied Vasquez's motion for a preliminary injunction. The court, nevertheless, sua sponte entered an injunction requiring Defendant Rick Raemisch, in his official capacity as executive director of the CDOC, to ensure that his subordinates tested Vasquez's liver functioning at least every three months. When the district court entered summary judgment for Defendants on Vasquez's damages claim, otherwise ending this litigation, the court made that injunction permanent.

In their cross-appeal, the State Defendants—CDOC Executive Director Raemisch, sued in his official capacity, and Defendants Davis, Webster, Melloh and Fauvel (but not Chamjock) sued in their individual capacity—challenge that permanent injunction, arguing that the district court abused its discretion 1) to the extent it entered the injunction against any Defendant sued in his individual capacity, and 2) in entering an injunction without finding the existence of any constitutional violation. We agree with the first point, the injunction can (and did) apply only to Defendant Raemisch in his official capacity. See Brown v. Montoya, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011). We need not address the second argument because Vasquez, in any event, does not contest that the injunction should be vacated. Accordingly, we remand this action with instructions for the district court to vacate this injunction and dismiss that action.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM summary judgment for Defendants in appeal No. 17-1026 and REMAND appeal No. 17-1044 to the district court to VACATE its permanent injunction and to dismiss that action as well.