## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20723

United States Court of Appeals
Fifth Circuit

**FILED**

May 15, 2020

Lyle W. Cayce
Clerk

LAURA COVINGTON,

Plaintiff - Appellant

v.

CITY OF MADISONVILLE, TEXAS; MADISONVILLE POLICE
DEPARTMENT,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CV-3300

Before SOUTHWICK, GRAVES, and ENGELHARDT, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Laura Covington appeals the district court's Rule 12(b)(6) dismissal of her claims asserted under 42 U.S.C. § 1983 against Defendant-Appellee City of Madisonville, Texas ("City"). Finding reversible error only with respect to the district court's dismissal of Plaintiff-Appellant's "single incident" failure to supervise claim and ratification claim, we REVERSE IN PART, AFFIRM IN PART, and REMAND.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-20723

## BACKGROUND

I. Procedural Background

In November 2013, Plaintiff-Appellant, Laura Covington ("Laura") filed suit against individual defendants and the City of Madisonville, Texas ("the City"), seeking to recover damages, under 42 U.S.C. § 1983, arising from her unlawful arrest on November 9, 2011, and consequent temporary loss of child custody. Laura was arrested and charged with a drug offense as a result of her ex-husband, Jeffrey Covington ("Jeffrey"), an officer with the Madisonville Police Department ("MPD"), having had methamphetamine planted underneath her vehicle. The charges against Laura eventually were dismissed in January 2013, and she regained custody of the children. In February 2013, following a lengthy investigation, Jeffrey and former MPD officer Justin Barham were arrested. Jeffrey was indicted on February 25, 2013. In April 2014, a jury found Jeffrey guilty of retaliation for which he received a probated sentence of 5 years confinement in the state prison, was required to surrender his peace officer license, and served 30 days confinement in county jail.

In the instant civil matter, Laura prevailed at trial on her claims against Jeffrey and other individual defendants and was awarded monetary damages. Prior to trial, however, the district court granted two Rule 12(b)(6) motions to dismiss filed by the City. The first motion was granted with Laura being allowed to amend her complaint. The district court granted the second motion with prejudice, however, reasoning that Laura had already had an opportunity to amend, and that any additional amendment would be futile. Thereafter, Laura filed a motion for reconsideration, contending the district court had not "specifically addressed" certain "critical allegations" in the second amended complaint "establishing municipal liability." The district court denied the motion, stating that it had thoroughly considered the parties' arguments and

2

No. 18-20723

relevant caselaw, and Laura's motion did not identify any manifest error or law or fact.[1] This appeal followed.

II. Factual Background

According to the second amended complaint, Laura and Jeffrey married in 2003, divorced in 2004, married a second time in 2007, and divorced again in 2010.  Prior to their first marriage, Jeffrey was an officer of the MPD, which employs a force of 6–8 persons for the City's population of approximately 4,500. Between 2006 and 2009, however, Jeffrey was employed by DynCorp International, a private corporation headquartered in Dubai, which served as a private security contractor to the United States Army's forces in Iraq. Jeffrey worked as a police advisor in Iraq. In 2009, however, finding Jeffrey had violated United States Policies and Codes of Conduct (by attempting to improperly purchase Viagra from an Iraqi vendor), DynCorp terminated his employment.

Upon Jeffrey's return to Madisonville, Chief of Police Clendennen re-hired him and, in May 2010, promoted him to K-9 officer.  In July 2010, Jeffrey became a Patrol Sergeant.  In that role, he supervised all Patrol Officers and was in charge of the MPD's confidential informants.

Laura and Jeffrey's relationship can fairly be described as troubled and acrimonious.  The parties' briefs and the second amended complaint describe a 2009 incident involving Laura raising a baseball bat "as if to hit him but not hit him," when, according to Laura, Jeffrey "'snapped,' grabbed [her] throat, threw her on the couch, [and] put his knee in [her] chest while choking her."

---

[1] Rather, the district court explained: "Plaintiff simply rehashes her previous arguments and takes issue with the Court's alleged failure to specifically address all of her 'critical allegations establishing municipal liability.'" The district court added: "The Court need not specially respond to every one of Plaintiff's allegations in order to conclude that she failed to meet the pleading standard for municipal liability." "Accordingly, the Court stands by its previous Opinion and Order."

No. 18-20723

The Madisonville police were called and responded. Apparently because the incident involved an MPD officer, Texas Ranger Stephen Jeter was asked to investigate the matter. Prosecution was later declined by the district attorney. Thereafter, Chief Clendennen required another officer to be present whenever Laura and Jeffrey were together. Later, in 2010, Child Protective Services and Texas Ranger Jeter investigated Jeffrey for allegedly improperly disciplining one of the children. The case was presented to a grand jury, but no charges were brought.

The methamphetamine found underneath Laura's vehicle on November 9, 2011, was discovered when a Texas state trooper, Carl Clary, stopped her for speeding and conducted a consensual search of her vehicle. Although Trooper Clary did not initially intend to search vehicle, he did so when Jeffrey, upon hearing Laura's name over the police radio, called Trooper Clary's cell phone. Jeffrey told Trooper Clary that Laura had tried to run over Jeffrey's current wife that morning and had drugs hidden in a magnetic key holder hidden under her vehicle. When Trooper Clary found the methamphetamine, Laura denied that that it belonged to her, and accused Jeffrey of planting the drugs, stating that she knew "something like this was going to happen." Concluding that Laura likely was correct, Trooper Clary reported the incident to the district attorney and Texas Ranger Andres De La Garza for investigation. Ultimately, the charges against Laura were dropped, the children were returned to Laura's custody, and Jeffrey was indicted, tried, and convicted.

Laura alleges that, after she and Jeffrey divorced in 2010 and he re-married, he sought to have her arrested in an effort to gain custody of their

young children.[2] According to the second amended complaint, Jeffrey frequently complained about his ongoing custody battles with Laura to other MPD officers and urged them to try to "find any reason to stop her and arrest her" in order to help his custody case. Eventually, Jeffrey sought to recruit one of the police department's CI's ("confidential informants") to plant illegal drugs in/on her vehicle. Laura alleges that drugs actually were planted twice—in March 2011 and November 2011—but the novice officer searching her vehicle the first time, in August 2011, failed to find them. To avoid such failure the second time, Jeffrey allegedly told Trooper Clary—two months before the November 2011 traffic stop—exactly how and where the drugs were hidden underneath Laura's vehicle. After drugs were found in her vehicle on November 9, 2011, Jeffrey filed an emergency ex parte petition seeking custody of the children. Ultimately, the children were returned to Laura's custody and, on November 8, 2012, Jeffrey voluntarily relinquished his parental rights to the children.

## ANALYSIS

Considering the City's second motion to dismiss, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court determined that Jeffrey's fabrication of evidence against Laura caused her to be arrested, falsely charged with a drug offense, and temporarily deprived of custody of her children. The district court likewise was satisfied that the events violated Laura's Fourteenth Amendment constitutional rights. Additionally, the district court accepted as true Laura's allegations that the Madisonville Chief of Police acted as the official policymaker for the City relative to the MPD.

---

[2] The second amended complaint alleges that Jeffrey's second wife, April, demanded that he "get rid of Laura, even if that meant getting rid of his children with Laura, or April was going to leave him." Thereafter, "April and Jeffrey set out devising a plan to get rid of Laura so as to obtain custody of Laura's children."

No. 18-20723

Nevertheless, the district court concluded that Laura's allegations failed to satisfy the "policy" and "moving force causation" elements necessary to establish municipal liability under 42 U.S.C. § 1983. Accordingly, because Laura had already had an opportunity to amend her complaint, the district court dismissed her claim for municipal liability against the City with prejudice. On appeal, Laura challenges the district court's negative assessment of her "policy" and "causation" allegations.[3]

I. <u>Rule 12(b)(6)</u>

An appellate court conducts a *de novo* review of a federal court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Clyce v. Butler,* 876 F.3d 145, 148 (5th Cir. 2017). Rule 12(b)(6) of the Federal Rules of Civil Procedures authorizes the filing of motions to dismiss asserting, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). Dismissal under Rule 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown— "'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 678–79 (quoting Fed. Rule Civ. P. 8(a)(2)). Thus, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true." *United States ex*

---

[3] Laura additionally argues that the district court erred by evaluating her motion for reconsideration pursuant to the standard for Federal Rule of Civil Procedure 59 (e) rather than the more lenient standard applicable to Federal Rule of Civil Procedure 54 (b). Even if such error occurred, it is harmless because it does not impact our resolution of the substantive aspects of Laura's appeal.

*rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. Factual allegations that are "merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility of entitlement to relief," and thus are inadequate. *Id.* (internal quotation marks omitted). Accordingly, the requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, i.e., the type of claim at issue).

In evaluating motions to dismiss filed under Rule 12(b)(6), the court "must accept all well-pleaded facts as true, and [] view them in the light most favorable to the plaintiff." *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir. 1992). Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001). On the other hand, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal,* 556 U.S. at 678 ("tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,*

556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give the defendant fair notice"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Though [a plaintiff] need not offer proof of her allegations at this stage, she still must plead facts that plausibly support each element of § 1983 municipal liability[.]" *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (citing *Iqbal,* 556 U.S. at 678).

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. *See Norris v. Hurst Tr.,* 500 F.3d 454, 461 n. 9 (5th Cir. 2007); *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 640 n. 2 (5th Cir. 2005). When a defendant attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, however, the court can also properly consider those documents. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir. 2000).

No. 18-20723

## II. Municipal Liability under 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

A municipality or other local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 471 (1986) (emphasis in original) (citing *Monell,* 436 U.S. at 665–683). They are not vicariously liable under § 1983 for their employees' actions. *Id.* at 478.

Municipal liability under § 1983 has three elements: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell,* 436 U.S. at 694). Requiring satisfaction of these elements is "necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.*

An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cty.,* 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski,* 237 F.3d at 579). Whatever

9

its form, to yield municipal liability under § 1983, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski,* 237 F. 3d at 580 (quoting *Monell,* 436 U.S. at 694). In other words, a plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *James,* 577 F.3d at 617 (quoting *Piotrowski,* 237 F.3d at 580). "Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation [would] most likely occur." *Burge v. St. Tammany Par*., 336 F.3d 363, 370 (5th Cir. 2003) (citing *Piotrowski,* 237 F.3d at 579).

On the other hand, where an alleged policy is facially innocuous, establishing the requisite official knowledges necessitates that a plaintiff demonstrate that the policy was promulgated or "implemented with 'deliberate indifference' to the 'known or obvious consequences' that constitutional violations would result." *See Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 407 (1997)), *cert. denied,* 139 S. Ct. 2690 (2019); *Burge,* 336 F.3d at 370 (must show "facially innocuous" policy or custom was "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result") (internal quotations omitted).

Establishing deliberate indifference generally requires a "'pattern of similar violations'" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge*, 336 F.3d at 370 (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 459 (5th Cir. 2001)). A narrow "single incident" exception to the pattern requirement, however, has been recognized. *Id.* For deliberate indifference to be based on a single incident, "'it should have been apparent to the policymaker that a

constitutional violation was the highly predictable consequence of a particular policy.'" *Alvarez*, 904 F.3d at 390 (quoting *Burge,* 336 F.3d at 373) (alleged facts must be such that "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train").

Mere negligence, even gross negligence, is not sufficient to establish deliberate indifference. *Brown v. Bryan Cty, OK,* 219 F.3d 450, 460–63 (5th Cir. 2000). The causal link "moving force" requirement and the degree of culpability "deliberate indifference" requirement must not be diluted, for "where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Alvarez*, 904 F.3d at 390 (internal quotations omitted).

## III. Application of Legal Principles

On appeal, Laura argues the district court erred in finding her "policy" and "moving force causation" allegations insufficient to withstand Rule 12(b)(6) scrutiny. Specifically, she contends the allegations of her second amended complaint support three theories of municipal liability against the City: (1) the Chief of Police maintained a custom and practice of tolerating misconduct among officers in the MPD; (2) the Chief of Police failed to supervise Jeffrey's management of the confidential informants and control of all narcotic investigations; and (3) the Chief of Police failed to screen Jeffrey's application to the MPD, and, in particular, to be a K-9 narcotics officer, when he had a history of drug violations. She maintains that the facts alleged support an inference that Chief Clendennen and/or Chief May acted with deliberate indifference "either by ignoring the obvious risk that constitutional violations would occur, or a pattern of conduct that should put the Chief on

notice there was a risk of constitutional violations by one of his officers."[4] Additionally, she contends, "the Chief of Police ratified Jeffrey's unconstitutional actions because, while both Chief Clendennen and Chief May were well aware of what Jeffrey was planning, they failed to intervene to stop it, and Chief May went so far as to cover up evidence of Jeffrey's culpability during the ensuing investigation and fallout after Jeffrey was indicted."

Although Laura's brief references "three theories" of municipal liability, her claims essentially allege deficiencies in Chief Clendennen's hiring policy, relative to hiring Jeffrey upon his 2009 termination from DynCorp, and Chief Clendennen's and Chief May's (allegedly inadequate) supervision policies. Regarding supervision, she attempts to allege both types of actionable "unofficial" supervision policies, i.e., a "widespread practice [of tolerating officer misconduct] that is so common and well-settled as to constitute a custom that fairly represents municipal policy" and a "single incident" municipal policy focused solely on Jeffrey's conduct.

A. Hiring Policy

Focusing first on hiring, we affirm the district court's dismissal of Laura's hiring policy claim without hesitation.  Viewing Jeffrey's 2009 hiring as a "single incident policy" of inadequate screening, Laura's factual assertions regarding "deliberate indifference" and "moving force  causation" are inadequate to state a legally viable claim for municipal liability. In other words, the allegations of the second amended complaint do *not* reasonably support an inference that "it should have been apparent [to Chief Clendennen] that the constitutional violations suffered by Laura were the 'highly predictable consequence'" of the Chief's lackluster screening practices

---

[4] Chief May replaced Chief Clendennen in September 2011.

relative to a former employee seeking to return to the MPD *or* that Chief Clendennen purposely chose to ignore that risk.  For similar reasons, Laura's assertions fail to establish any connection between Chief Clendennen's hiring practice deficiencies and the constitutional violations she suffered, much less the "moving force" direct causation that is required.

B. Supervision Policy – "Widespread Practice"

Regarding supervision, Laura's submissions outline various alleged infractions and instances of wrongdoing by other officers employed by the MPD in support of her "widespread practice" supervision claim. She adds: "nearly one-half of the City's police were fired or resigned in a six-month period."  None of the conduct alleged, however, bears the necessary similarity to the purposeful fabrication and planting of evidence/false arrest misconduct involved here. Indeed, in many instances, the allegations reflect some disciplinary or other remedial actions being taken by the supervising police chief. Furthermore, a voluntary resignation is not itself indicative of an inadequate supervision policy. Finally, without more information, the departure numbers alleged by Laura are not particularly meaningful. For instance, no assertion of typical turnover rates is given, especially for a small-town police force of, at most, only 6–8 officers. Thus, the district court's rejection of these assertions as supporting an actionable claim warrants affirmance.

C. Supervision Policy – "Single Incident"

On the other hand, the propriety of the district court's dismissal of Laura's alleged "single incident" supervision claim—focusing solely on Jeffrey's misconduct relative to Laura's November 9, 2011 false arrest—presents a much closer call.  Laura's second amended complaint alleges: "Everybody at the police department (if not the entire community) knew about [Jeffrey's] battle with [Laura], and his efforts to conspire to have

[Laura] wrongfully arrested and prosecuted."   More importantly, Laura specifically alleges that, on separate occasions, two MPD officers—Officer Sims and Officer Jonathan Lawrenz—reported Jeffrey's intentions and efforts (relative to having Laura arrested based on planted illegal drugs) directly to Chief May.  In response, rather than personally investigating the reports, or referring them to the Texas Rangers for investigation, Chief May allegedly did nothing to determine their validity.  Instead, when Officer Sims purportedly told Chief May, in October 2011, that "*he was getting a lot of word from [his] snitches that Jeff is trying to find somebody to plant dope on Laura's car because of this custody battle,*" Chief May only responded: "*Well, I don't believe it. It's just a bunch of crackheads.*"

Viewing the allegations of the second amended complaint in Laura's favor, as we must, Officer Sims' "snitches" presumably refer to the confidential informants of which Jeffrey allegedly was "in charge," and from whom the MPD regularly sought to obtain information in aid of their drug investigations. Construed in this manner, Chief May's deliberate and outright rejection of the possible validity of what the "snitches" were saying—without conducting even a minimal investigation—arguably falls short. This is particularly so given Officer Sims' experience and credentials—his employment by the MPD since November 2004, and his twenty-six years with the United States Military Police/C.I.D., including active service in Iraq as a military police officer (attached to the Drugs C.I.D.)—and his presumed credibility. Finally, had Chief May chosen to investigate the egregious and unlawful misconduct that his officers reported to him, he also likely would have discovered the "audio and video records of Jeffrey conspiring against Laura" that Jeffrey had saved on the MPD's computer system.

As set forth above, however, asserting an actionable failure to supervise § 1983 municipal liability claim requires allegations establishing a "direct

causal link between the policy and the proclaimed violation." The policy also must have been implemented by the policymaker with the requisite culpability, i.e., "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result.

Regarding causation, the asserted motivations for Jeffrey's conduct were purely personal. Nevertheless, construing the allegations of the second amended complaint in Laura's favor, had Chief May investigated the reports of Jeffrey's "false arrest" plot, a reasonable inference can be drawn—especially given the allegations regarding the number of persons aware of Jeffrey's plan—that Laura's arrest, criminal charges, and loss of child custody would have been prevented or at least promptly remedied. Thus, in that sense, the City caused the violation by not timely employing appropriate supervisory measures in order to prevent reasonably anticipated unlawful conduct by a city employee.

Similarly, the obvious likely consequence of a municipal supervisor's refusal to investigate a municipal employee's scheme—to plant evidence in order to bring about a false arrest and criminal charges—is that the plot works as planned, i.e. the evidence is planted, the false arrest is made, and criminal charges follow. What's more, the information provided by Officers Sims and Lawrenz is not the only information that Chief May had tending to support the likelihood that Jeffrey was trying to do exactly what the "snitches" said he was doing. Chief May allegedly was personally aware of the ongoing custody disputes between Laura and Jeffrey and their acrimonious history. Furthermore, Chief May had to realize that, if Jeffrey was attempting such a scheme, the likelihood of its success was fairly high. Given Jeffrey's position as senior narcotics investigator and his involvement with the MPD confidential informants, he presumably had access to illegal drugs and persons willing and able to plant them. And, as evidenced by Jeffrey's

telephone call to Trooper Clary, which caused Trooper Clary to search Laura's vehicle for drugs when he otherwise would not, Jeffrey's law enforcement status at least potentially increased the likelihood that the planted drugs eventually would be discovered by another law enforcement officer and Laura arrested.

In short, construing Laura's allegations in the manner required  for Rule 12(b)(6) motions, this close call is one that, at this stage of the proceeding, should have gone in Laura's favor.  Although Laura's supervision claim ultimately may not withstand a motion for summary judgment filed after discovery, or prevail at trial, neither scenario is determinative of this appeal.  Accordingly, we find the district court erred in dismissing Laura's failure to supervise § 1983 claim with prejudice.

D. Ratification

Laura's final argument on appeal in support of municipal liability is her assertion that Chief May, a policymaker, ratified Jeffrey's unlawful actions. Ratification in this context requires that a policymaker knowingly approve a subordinate's actions and the improper basis for those actions. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988);  *Beattie v. Madison Cty. Sch. Dist.,* 254 F.3d 595, 603 n.9 (5th Cir. 2001). Otherwise, unless conduct is "manifestly indefensible," a policymaker's mistaken defense of a subordinate who is later found to have broken the law is not ratification chargeable to the municipality. *Coon v. Ledbetter,* 780 F.2d 1158, 1161–62 (5th Cir. 1986) (sheriff's defense of deputies premised upon his acceptance of their version of events did not equate to county policy approving reckless police behavior).

Regarding ratification, Laura's brief argues that Chief May ratified Jeffrey's unconstitutional conduct by "fail[ing] to intervene to stop" him and by "cover[ing] up evidence of Jeffrey's culpability during the ensuing investigation and fallout after Jeffrey was indicted." In short, she maintains

that Chief May tried to "cover up [Jeffrey's conduct] after it was clear what [he] had done." Relatedly, her second amended complaint alleges that Chief May failed to provide audio recordings, which he and Sims discussed in late July 2012, to the Texas Ranger investigating Jeffrey's conduct, and failed to properly label and investigate a statement written by Toby Smith (a confidential informant) asserting that Jeffrey had offered to pay Smith to plant drugs in Laura's car, that "[m]onths later[,] she gets busted" and "[w]as set up." Construed in Laura's favor, and considered together with her assertions regarding Chief May's alleged failure to supervise Jeffrey prior to planted drugs being found in her vehicle in November 2011, we likewise conclude that Laura's ratification assertions, though cursorily stated, are sufficient to survive Rule 12(b)(6) attack. Thus, the district court also erred in dismissing Laura's § 1983 municipal liability claim insofar as it is premised upon Chief May's alleged ratification of Jeffrey's unlawful actions against Laura.

## CONCLUSION

Applying governing legal principles, we hold that the district court erred in dismissing the "single incident" failure to supervise claim, and the ratification claim, asserted against the City of Madisonville, Texas, pursuant to 42 U.S.C. § 1983, by Plaintiff-Appellant Laura Covington. Finding no reversible error relative to the district court's dismissal of the remainder of the claims asserted herein, we REVERSE IN PART, AFFIRM IN PART, and REMAND.

17